---

## Case No. 3,663.

### DAVY v. FAW.

[1 Cranch, C. C. 89.][1]

Circuit Court, District of Columbia. April Term, 1802.

[NOTE. See Faw v. Davy, Case No. 4,701.]

---

DAVY (FAW v.). See Case No. 4,701.

[1] [Reported by Hon. William Cranch, Chief Judge.]

DAVY (ROSS v.). See Case No. 12,073.

DAWES (BANK OF COLUMBIA v.). See Case No. 865.

---

## Case No. 3,664.

### DAWES et al. v. CORCORAN.

[1 Cranch, C. C. 137.][1]

Circuit Court, District of Columbia. July Term, 1803.

WITNESSES—CROSS-EXAMINATION.

Leading questions may be asked in cross-examining a witness.

Assumpsit.

---

DAWES (STOKES v.). See Case No. 13,477.

---

## Case No. 3,665.

### The DAWN.

[1 Ware (485) 499.][2]

District Court, D. Maine. Feb. 21. 1839.

SEAMEN'S WAGES—SALE OF SHIP IN FOREIGN COUNTRY—WRECK—BURDEN OF PROOF.

1. The act of congress of February, 1803, c. 62 [2 Stat. 203], allowing two months' extra wages to the crew, upon the sale of the vessel and their discharge in a foreign country, applies only to the case of a voluntary sale of a vessel, and not when the sale is rendered necessary by shipwreck.

[Cited in Dustin v. Murray, Case No. 4,201.]

2. If the vessel is sold in consequence of a disaster at sea, the owners will not be exempted from the payment of the extra wages, if the vessel can be repaired at a reasonable expense and in a reasonable time, and the burden of proof, to show that she could not so be repaired, is upon the owners.

This was a suit for subtraction of wages. The libellant shipped as mate for a voyage from Boston to Turk's Island, and back to her port of discharge in the United States, for wages at the rate of twenty-five dollars a month. The brig sailed December 4, 1836, and when four days out met with heavy gales, by which she was much injured in her spars and rigging, and strained in her hull. The ballast was shifted, the pump-well broken, and the pump forced up three feet and a half, so as to render it impracti-

[1] [Reported by Hon. William Cranch, Chief Judge.]
[2] [Reported by Hon. Ashur Ware, District Judge.]

cable to keep her clear of water. On the 16th of the month, being in latitude 32°, the vessel being in a crippled state, with only four sails remaining, and those old and damaged by the gale, and several of her spars lost, the master abandoned all hope of reaching his port of destination, and for the safety of the lives of the crew bore up for Bermuda, and on the 28th arrived at the port of Hamilton. Here a survey was called, and after an examination of the brig she was pronounced unseaworthy, and in consequence of her age and disabled condition not worth repairing. She was accordingly sold and the crew discharged. The libellant was paid his wages up to the time of his discharge.

C. S. Daveis, for libellant.
T. A. Deblois, for respondent.

WARE, District Judge. The facts in this case are not controverted. They appear in the pleadings, in the protest of the master and crew, and in the report of the surveyors. Two questions have been raised, and have been very fully and ably discussed at the bar; first, whether the libellant is entitled to two months extra pay under the act of congress of February, 1803, c. 62, § 3; and secondly, if the case is not within the purview of the act, whether, by the general principles of the maritime law, he can claim any thing beyond the full amount of his monthly wages up to the time of his actual discharge.

In the first place it may be proper to advert to one ground of defence insisted upon at the argument, which, if well founded, it is contended, at once withdraws the case from the operation of the statute. It is this, that the sale was made by order of law, and not by the authority of the master; and consequently neither he nor the owners can be held responsible for any of the legal consequences attached to a sale under such circumstances. In what light the case might have been considered if the master had applied to a court of admiralty for a survey, and the court had, on the coming in of the report of the surveyors, by a regular decree pronounced her unworthy of repairs and ordered her to be sold for the benefit of all who had an interest in her, it is not necessary in this case to decide. Sir Wm. Scott has on several occasions expressed an opinion in favor of the jurisdiction of a court of admiralty to order a sale under such circumstances as are presented by the present case. The Gratitudine, 3 C. Rob. Adm. 259; The Fanny and Elmira, Edw. Adm. 118; The Warrior, 2 Dods. 288. But the validity of such sales is not admitted by the courts of common law in England. Reid v. Darby, 10 East, 143; Morris v. Robison, 3 Barn. & C. 196. In this country the jurisdiction of the admiralty to order a sale of the vessel, on the application of the master in such cases of distress, has been viewed with more favor, and such a decree of sale is vindicated not only as a beneficial, but a rightful exercise of authority. The Tilton [Case No. 14,054]; Janny v. Columbian Ins. Co., 10 Wheat. [23 U. S.] 411. But then the decree is only prima facie evidence of that necessity upon which it is professed to be founded. It is not conclusive on the rights of persons who are not parties to the proceedings. In the present case, however, no such judicial proceedings were instituted. The master upon his arrival consigned the vessel to certain merchants of that place. They applied to the governor of the island for a warrant of survey, who appointed the surveyors. The surveyors, after examining the vessel, reported the state in which they found her; and there all proceedings having the semblance of legal proceedings terminated. There was no action of any court, nor of any of the public authorities of the island upon the report; but after it was made the sale was ordered by the consignees. All the authority they had was derived from the master, and their acts must be considered as his. The sale therefore can be viewed in no other light, than as having been made by the authority of the master.

The act of congress provides, that "whenever any ship or vessel, belonging to a citizen of the United States, shall be sold in a foreign country and her company discharged, or when any seaman or mariner, a citizen of the United States, shall with his own consent be discharged in a foreign country, it shall be the duty of the master to produce to the consul, &c., the list of his ship's company and pay to such consul, &c., for every such mariner so discharged, being designated on such list as a citizen of the United States, three months pay over and above the wages which may then be due to such mariner or seaman; two thirds of which to be paid by such consul, &c., to each seaman or mariner so discharged, upon his engagement on board any vessel to return to the United States; the remaining third to be retained for the purpose of creating a fund for the payment of the passages of seamen and mariners, citizens of the United States, who may be desirous of returning to the United States, and for the maintenance of American seamen who may be destitute in such foreign port." It is contended for the libellant that this case falls within both of the hypotheses provided for by the statute; that the vessel was sold in a foreign country, and that the libellant not objecting to the sale and to the dissolution of his contract, by breaking up the voyage in this way, was discharged with his own consent. The statute is apparently intended to provide for the case of a dissolution of the contract by the voluntary act of the owners or of the master, their agent, in a foreign country, in the first place by the sale of the vessel, by which the voyage is broken

up and terminated, and in the second by the discharge of the seamen by the voluntary act of the master, with the consent of the seamen. This is the natural and obvious construction of the act. If it had been the intention of the legislature to comprehend cases of a forced and necessary dissolution of the contract, as by shipwreck, capture, seizure, and forfeiture of the vessel without the fault of the master or owners, or by any fortuitous occurrence against which human foresight and power could not provide, we should have expected some words would have been used indicative of such an intention. By the terms of the act, one third of the wages paid to the consul is to be retained by him as a fund to provide for the relief and to send home destitute American seamen. It is not gratuitously to be supposed that the legislature intended to raise a fund even for charitable purposes, by a tax on calamity and misfortune. Such an intention ought not to be inferred from general language that may well be satisfied with a more limited operation. And this construction, that it applies only to the case of a voluntary sale of the vessel, is the one which was given to the statute by the circuit court in the case of The Saratoga [Case No. 12,355]. The act also may probably apply to cases where the original object of the voyage is a sale of the vessel in a foreign port. But that aspect of the law does not present itself in the present case. The same remarks will apply with the same force to the other branch of the statute, which was relied upon at the argument, the discharge of the seaman with his own consent. To come within the act it must be a discharge by the voluntary act of the master, and not a mere separation from the vessel by the unavoidable breaking up of the voyage by misfortune. Indeed a seaman cannot in propriety of language be said to be discharged by the master, when the master himself is dispossessed of the vessel, and the whole enterprise is brought to a violent end, by an accident of major force. A discharge imports, in the natural and ordinary meaning of the word, a voluntary act on the part of the master.

If this be the true construction of the act, the question whether the libellant can maintain a claim for the two months' wages depends on the fact whether this was a voluntary sale on the part of the master, or a sale rendered necessary by inevitable accident; in other words whether the injuries, which the vessel sustained from the violence of the weather, were such that she was incapable of being repaired and proceeding on her voyage, or incapable of being thus repaired without so much expense and delay as to render it clearly for the interest of those who were to bear the loss to dispose of the vessel as a wreck where she was, rather than attempt to refit her and continue the voyage. It is indeed physically possible to repair a vessel when nothing remains of her but the keel. When we speak of the impossibility of repairing her, nothing more, therefore, is meant, than that she was in such a damaged and destitute condition that she was not worth repairing. The law is not so unreasonable as to require the owners, for the purpose of fulfilling their contract with the crew, to rebuild the ship at a ruinous sacrifice, merely because there is a physical possibility of doing it. But if the damage is not of so grave a character, but that she may well be repaired within a reasonable time, and at a reasonable expense, the case will not be withdrawn from the statute because the owner, or master, happens to meet with an opportunity of disposing of the vessel on advantageous terms, and making a better speculation by the sale than by repairing and continuing the voyage. This was the case of Pool v. Welsh [Case No. 11,269], and the court ruled that there was nothing in the facts of the case, although the protest of a shipwreck was set up in the defence, that took from the act the character of a voluntary discharge. And this question of eventual loss upon repairing and proceeding on the voyage is, I apprehend, to be viewed in relation to the party who is ultimately to bear it. If the owner is highly insured he may think it for his interest to abandon and sell the vessel, and convert a partial into a total loss, when if he were uninsured he might find his interest would be best served by repairing her and proceeding on the voyage. In such a case it appears to me that if the owner, or the master for him, chooses to sell as the easiest way of extricating him from the disaster by shifting the loss or a part of it upon the underwriters, it must be considered as a voluntary sale, and the seamen entitled to their two months' wages. These are calculations in which the interests the seamen have, in prosecuting the voyage and earning their wages, are not taken into the account. The master looks solely to the interests of the owner.

Now the embarrassing part of this case is that the evidence leaves the matter, to say the least, somewhat uncertain whether the brig was abandoned because the injuries were so considerable that she was not under any circumstances worth repairing, or only not worth repairing for the owner who was insured, as appears from the statement, which has been admitted in evidence, to the amount of four-fifths of the value on the brig, and on the cargo; within a few dollars of its full value. All the evidence we have is the report of the surveyors, unattended by any explanation beyond what appears upon the face of the report. These surveys when made in the most formal manner, under an order of a court of admiralty, are never conclusive on the rights of third persons (The

Tilton [supra]), and for many purposes are entirely inadmissible as evidence, as in a suit on the policy between the insurer and insured (Dorr v. Pacific Ins. Co., 7 Wheat. [20 U. S.] 611). It is I think admissible for the purposes of this case, but it is at best only prima facie evidence, and not perhaps of the most stringent character, even as prima facie proof. The survey is entirely an ex parte proceeding procured at the instance of the master. The surveyors are subjected to no cross-examination of an adverse party, and it is not perhaps presuming too much to suppose that their reports may often receive the coloring favorable to the known or supposed wishes and interests of a party who employs them. The report states the loss which the brig sustained in her masts, spars, and rigging, together with certain injuries to her hull. It is obvious that there can be no difficulty in supplying the loss of spars and rigging. The injuries to the hull, which the report enumerates, are that the water-ways abreast of the main-mast, on both sides, were much strained. The cabin work showed appearances of her having strained and worked aft; in the hold, the thick streak above the lower beams, on the starboard side, was found rent and split to the extent of about twelve feet in length, and in one place nearly broken across; the cross break three of the surveyors thought was new, but the rent was an old one, though it had been well secured by fastening. On the outside of the vessel one of the bolts, which fastened the knee opposite, had worked loose; about the stern she seemed to have strained greatly, particularly that part of the stern-post by the upper brace, and there appeared to be considerable water in the hold; but the surveyors could not try the pumps in consequence of the ballast having shifted and forced one of them up. The report concludes by saying that, "upon maturely weighing the general condition of the brig, the great extent of her distress in masts, spars, sails, and rigging, but looking particularly to the disabled state of her hull about the stern, all these circumstances, coupled with the age of the vessel, decide us in our opinion that she is unworthy of repair and refitting for the sea."

From the guarded and general terms in which the surveyors have expressed their conclusion, it seems to have been something of a balanced question in their minds whether the brig ought to have been repaired or not; and from the particular description of the injuries to the hull, given in the report, connected with the fact that the brig kept at sea twenty days after the principal damage was received, that is, from the 3d to the 28th of December, without any extraordinary danger, it appears to me that a court must find a great deal of difficulty in saying upon the facts which appear in the report alone, unaided in its judgment by any further elucidation of the matter, that this was a case of such extensive damage to the vessel, that the interest of all who were concerned in the loss required that she should be abandoned and sold as a wreck; or that such a clear case of necessity is made out for breaking up the voyage as to take from the sale the character of a voluntary act on the part of the master. That the sale was a determination favorable to the interest of the owner, largely insured as he was, is highly probable. His vessel had encountered a disaster from which he could not escape without loss, and the lightest loss for him would in all probability be to abandon the voyage and call upon the underwriters to pay the insurance. They had taken the risk and been paid for it. Nor do I mean to intimate an opinion that there was any thing unfair or improper in the sale as between the owner and insurers. That cause is not before me; and their rights are to be decided by the law of the contract between them. But in that determination the interests and rights of other parties were involved. The owner had contracted with the crew to perform the voyage and to pay them their wages. They had bound themselves to render their services; and in opposition to the general maxim of the law applicable to all other contracts faciendi, to do any particular thing, that is, that no one can be compelled peremptorily to do a specific act, "nemo cogi potest praecisé ad factum," the precise performance of the contract on their part might be enforced by stripes, chains, and imprisonment. Poth. Cont. Mar. No. 183. The owner became equally bound to give them the employment and pay the stipulated price; but a failure on his part in performing the obligation of the contract merely resolved itself as in other cases into an action for damages. If he voluntarily and without necessity abandons the voyage, and puts an end to the contract before it is executed, and thus prevents them from earning wages, he renders himself, on the common principles of the contract of hiring, responsible for damages. The rule of the civil law in such cases is, that the laborer is entitled to the full compensation which would be due for the performance of the entire contract (Dig. 19, 2, 38), unless he has had an opportunity of earning wages in another employment (Dig. 19, 2, 19, § 9). It is a general principle applicable to the contract of hiring, that when it is owing to the hirer himself that he has not had the enjoyment of the thing or the benefit of the contract, the whole hire is due. In the contract for the hire of labor or service, the rigor of the principle is tempered in favor of the employer, by deducting the wages which the laborer may or might have earned during the time in other employments. Poth. Cont. de Louage, Nos. 142, 173; Poth. Cont. Mar. No. 198; Domat, liv. 1, tit. 4, § 9, No. 6.

The maritime law, as it is administered in this country, in case of the discharge of a

seaman before the termination of the contract, without a valid cause, nearly agrees with the doctrine of the civil law. The right of the seaman is resolved into an action of damages; and the general rule of damages is, that the seaman shall be placed in as good a condition as if the contract had been performed. Emerson v. Howland [Case No. 4,441]. But when the contract is dissolved by the owner, by the sale of the vessel and a breaking up of the voyage in a foreign port, the statute comes in and fixes the amount of damage by an arbitrary rule, allowing two months' additional wages. Upon the general principles of the contract of hiring, the hirer is not responsible when the performance of the contract on his part is rendered impossible by an accident of major force; for no one is responsible for fortuitous events, unless he takes these risks upon himself by the express terms of the contract. The construction which has been put upon the statute is in this particular conformable to the general rule of law; it is that the statute does not extend to a case where the sale of the vessel is rendered necessary by such an accident, and of course in such a case the statute damages are not due. But when a party would exempt himself from the obligations of his contract by alleging an accident of major force, the onus probandi lies upon him to prove the necessity which constitutes his excuse. This is the general rule; and the reason of the rule applies as strongly when the statute damages are claimed as when the claim is for damages under the general law of the contract.

Whatever view we take of the case, then, we are brought back to this embarrassing difficulty, the imperfect state of the evidence on this essential point, whether the damage sustained by the vessel was so considerable that the interest of all concerned required that the voyage should be broken up, and the vessel abandoned and sold as a wreck. If within a reasonable time, and at a reasonable expense she might have been repaired and fitted to proceed upon the voyage, then my opinion is that it must be considered as a voluntary sale on the part of the master, and the extra wages are due. The case of Pool v. Welsh [supra], is a direct authority to this point. The language of the statute is general. When a vessel is sold in a foreign country the extra wages shall be paid; and if the owner would exempt himself from the payment, he must show that the sale is within the exception, that it was a sale rendered necessary by unavoidable accident. As satisfactory proof of this fact is not produced, the consequences must rest with that party upon whom the legal obligation is imposed of producing it. After the best consideration I have been able to give the case, I am brought to the conclusion that the wages are due. This view of the question being decisive of the case, it becomes unnecessary to consider the other point

which was argued at the bar, whether in case of a shipwreck with salvage, the crew can in any case claim any thing, in the nature of salvage, beyond the amount of wages due at the time of the misfortune.

[NOTE. For further opinion in this case on the same subject, see Case No. 3,666.]